IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 7, 2013

### IN RE E.K. ET AL.

**Appeal from the Juvenile Court for Monroe County**
**No. J13-069     J. Reed Dixon, Judge**

_____

**No. E2013-01776-COA-R3-PT-FILED-JANUARY 28, 2014**

_____

D.K., Sr., ("Father") appeals the termination of his rights to his three minor daughters E.K., H.K., and H.K. (collectively, "the Children").[1] The Department of Children's Services ("DCS") had a history of involvement with Father, the Children, and another older minor child, D.K., Jr.[2] In 2007, all four children were taken into protective custody following an incident of domestic violence between Father and his then-wife, C.K. ("Stepmother"). In the earlier matter, custody of the four children was awarded to Stepmother; Father was allowed supervised visitation. In 2012, the Children were placed in the protective custody of DCS following allegations of physical and psychological abuse by Stepmother. Father was not a placement option because of "ongoing Juvenile Court matters" concerning D.K. Jr. as well as a lack of space in his home. Stepmother waived her right to a hearing and the Children were adjudicated dependent and neglected by an agreed order. They entered DCS custody and were placed in foster care.[3] A year later, DCS initiated termination proceedings. After a bench trial, the court terminated Father's rights based on his failure to comply substantially

---

[1] In the same proceeding, the court terminated the parental rights of the Children's biological mother, J.S. ("Mother"). Mother, who had no contact with the Children in the past ten years, did not appear at the termination hearing and is not a party to this appeal. We refer to her only as is necessary to present the underlying facts relevant to Father's appeal.

[2] Father is also the biological parent of D.K. Jr., who was initially a subject of the termination petition in the present case. In 2009, Father was convicted, pursuant to his guilty plea, of physically abusing D.K. Jr., and ordered to serve six months in jail. D.K. Jr., was adjudicated dependent, neglected and delinquent. He entered juvenile justice custody; then DCS custody in 2011. After the termination petition in the present case was filed, but before trial, Father voluntarily surrendered his rights to D.K. Jr. Accordingly, the termination order has no application as between Father and D.K. Jr., and the latter is not a subject of this appeal.

[3] This case began in the McMinn County Juvenile Court; it was later transferred to Monroe County for disposition.

with the requirements of the Children's permanency plans. The court further found that termination was in the best interest of the Children. Both findings were said by the court to be made by clear and convincing evidence. Father appeals and challenges each of these determinations. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES J. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

John McMurray Johnson, Madisonville, Tennessee, for the appellant, D.K., Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Leslie Curry, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

In February 2013, DCS filed a petition to terminate the parental rights of the biological parents. Trial was held in June 2013. By then, E.K. was 14 and H.K. and H.K., who are twins, were 12. The Children had remained in foster care since February 2012. They lived together in the same house in Cleveland since October 2012. Father was married for a fourth time. Since the summer of 2012, he and his new wife have lived on a houseboat docked at Tellico Marina in Maryville. At the time of trial, Father had not had custody of the Children for the preceding five years. In addition, D.K. Jr. remained in DCS custody after a trial home visit was terminated due to Father's failure to comply with the conditions set for the visit.

In July 2011, DCS developed an initial permanency plan that applied only to D.K. Jr. The plan's requirements were the same for both parents: obtain reliable transportation, an adequate, legal source of income, and suitable housing; complete an alcohol and drug assessment and follow any recommendations; and undergo a mental health assessment. Father signed the plan to indicate that he participated in the plan's development and that he agreed with its terms. In March 2012, a second plan was established to include the Children who, by that time, had come into state custody. The plan maintained the previous requirements for Father, *i.e.*, to obtain employment, housing and transportation. In addition, the plan required Father to provide DCS with his weekly work schedule; confirm visits with

the Children within 24 hours of scheduled visits; conduct himself appropriately during visits and refrain from discussing the case with the Children; cooperate with existing family service providers; attend family counseling; and provide documentation to DCS from counselors to indicate compliance with the permanency plan. In August 2012, the plan was again revised. It required that Father submit to and pass random drug screens; complete a parenting assessment and follow recommendations; complete a new alcohol and drug assessment and follow recommendations; provide suitable housing for the Children; attend individualized education planning for the Children; participate in family counseling; and follow visitation guidelines.

With respect to Father, the bulk of the testimony at trial came from the Children's DCS case worker and other service providers. They essentially concurred regarding Father's lack of cooperation and their efforts to assist him with the permanency plan tasks. Father was described as often being "combative" and "insulting" and, sometimes, threatening. Father completed some tasks, but admitted he had not complied with numerous others requirements for various reasons. He admitted he had grown frustrated with DCS and their procedures. At a 2013 DCS Child and Family Team Meeting, Father denied any need for services. He stated that the only thing he needed from DCS was for it "to crawl out of his ass and give him his children back." At trial, Father admitted making statements to case workers that he regretted. Father testified he loved the Children and would do anything to get them back.

Since entering their current foster home, the Children had made great strides. According to their foster mother, they had gained confidence in themselves, made friends, and progressed academically and therapeutically. All three girls had individualized education plans. Although they had not lived with their brother since 2009, they visited him each month. Their DSC case worker described the Children as "active . . . , funny, . . . vibrant kids." At the same time, she acknowledged that they came with "significant parenting needs" – the twins were diagnosed with bipolar disorder for which they received medication and counseling. All three children suffered with post-traumatic stress disorder that required specialized parenting techniques and interventions. The case worker admitted that the Children shared a bond with Father and were excited to see him during visits. The Children had also developed a bond with their foster parents – whom they called "mom" and "dad"– and had established roots in their new community.

After the hearing, the court concluded that DCS had proven, by clear and convincing evidence, the existence of a ground for termination and that termination was in the Children's best interest. More specifically, the court found, as to Father, that he failed to comply substantially with the terms of the Children's permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2)(Supp. 2013). In summary, the trial court found that, "[b]y his own account, [Father] has no suitable home to which the children could return and he has failed to address

his own issues which gives this Court grave concern that he would be able to address the issues of the children." Father filed a timely notice of appeal.

II.

Father raises issues for our review that we restate as follows:

1. Whether the trial court erred in finding the existence of clear and convincing evidence that Father failed to substantially comply with the permanency plans ratified by the trial court.

2. Whether the trial court erred in the manner in which it applied the best interest analysis and/or erred in finding that the termination of Father's parental rights was in the best interest of the Children.

III.

With respect to parental termination cases, this Court has observed:

It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at \*11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which will not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002). We proceed mindful that only a single ground must be clearly and convincingly proven to justify termination. *In re Audrey S*., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

The trial court terminated Father's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2) based on its finding that Father failed to comply substantially with his responsibilities as set forth in the permanency plan. The permanency plan is "a written plan that sets out requirements to achieve family reunification or other appropriate goals, such as adoption or permanent foster care." *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 765 (Tenn. 2006). In *A.M.H.*, the Supreme Court observed:

> Pursuant to T.C.A. § 36-1-113(g)(2), parental rights may be terminated upon proof by clear and convincing evidence that "there has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care...." The requirements must be stated in specific terms and must be reasonably related to the specified goal. Substantial compliance with the statement of responsibilities in a child's permanency plan is essential. However, substantial noncompliance will not be found based on minor, trivial, or technical deviations from a permanency plan.

*Id*.

In the present case, Father asserts that the trial court's finding of substantial noncompliance with a permanency plan was not sufficiently supported by the evidence. He argues that (1) the trial court never found that the plans' requirements were related to the conditions that necessitated placing the Children in foster care; and (2) although he substantially complied with the same or similar requirements set out in previous permanency plans established for D.K. Jr., those requirements are "inconsequential" to the Children's

case. As to the second point, Father further asserts: "These requirements were unrelated to remedying the conditions that necessitated the removal of the [Children] from [Stepmother's home] and therefore [Father's] compliance with said requirements is irrelevant and cannot be the basis for termination of [Father's] parental rights" to the Children.

In finding that Father was in substantial noncompliance with permanency plan requirements, the trial court stated:

> Been a long going case that's been before the Court, it seems like forever, involving [Father] and . . . his children.
>
> But all that is really coming down to . . . these three young ladies who have not been in his custody for five years.
>
> [Father] has had extensive involvement with DCS over that period of time. First, with his older child . . . for whom he's surrendered his parental rights, because of [his] inability . . . to properly address those issues. . . .
>
> The [Children] . . . are the subject of today. . . . And the question is, has he done anything, since DCS has had custody . . . to address the issues that they identified to him, specifically, that he would need to address in order to regain custody.
>
> [E]ssentially, it seems to the Court that the biggest issue that [Father] has had is that he just simply does not accept that he has any issues that he needs to address. He has a reason for all these things . . . .
>
> [T]he first issue that . . . comes to mind . . . is housing. [Father] is living in – even after all this time, he's gone from a three-bedroom trailer to a four-bedroom trailer, which he abandoned and moved into a houseboat that he admits is not adequate, . . . not for custody, but even for visitation. It's just too small to accommodate any need. Nor has he shown any indication, other than saying he was willing to do anything, to address that housing issue.
>
> DCS had provided numerous services to him, through numerous agencies, to try to help him address anger management issues,

drug use issues, parenting class issues, . . . and each occasion has been met with resistence by [Father]. Primarily, because . . . [Father] acknowledges to the Court that he continues to fail drug screens, . . . but he doesn't have a problem.

I was particularly struck with his statement that he hasn't lost anything because of his drug use, and then he amended that to say except his children.

Well, he just acknowledged to the Court that he lost his children because of his drug use, and further acknowledged no intention to attempt to address those issues. He refuses to acknowledge that he needs any treatment.

It's clear to the Court by all the evidence today that the State has established by clear and convincing evidence that the conditions which have prevented [Father] from having custody of his children persist, and that he has substantial noncompliance with what I think to be reasonable requirements for him to satisfy. In terms of parenting classes, anger management treatment, drug evaluations and following the recommendations, adequate housing, visitation that's constructive, those things just haven't happened. Primarily, because, I think, [Father] seriously, honestly, truly believes that he doesn't have those issues, and that he's being harassed by DCS unfairly. . . .

So I think they clearly . . . have demonstrated that he has substantially failed to comply with the various parenting plans.

The Children's initial permanency plan of March 2012 gave Father three and a half months to complete certain "action steps" toward the stated goal of reunifying him with the Children. He was essentially required to obtain reliable transportation, an adequate source of income and suitable housing, among other tasks. Although the time frame for completing these tasks was somewhat short, a point Father emphasized at trial, he acknowledges that these same tasks had already been assigned to him in the earlier plans established for D.K. Jr.[4] Again, Father participated in the development of the Children's plan and signed it. The trial court expressly found that the requirements were reasonable. Moreover, the plan was

_____

[4]A permanency plan created for D.K. Jr. in March 2011 in the juvenile justice program also required Father to maintain adequate employment, housing, and transportation and to complete court-ordered anger management, parenting classes, and an alcohol and drug assessment.

ratified by Judge Paul Smith, McMinn County Juvenile Court, on May 24, 2012. The judge's signature appears immediately below the following typewritten statements:

> The responsibilities outlined in the plan are reasonably related to the achievement of the goal, are related to remedying the conditions[] which necessitated foster care, and are in the best interest of the child[ren].
>
> The Court has reviewed and APPROVES the plan.

(Capitalization in original.) In view of all of this, we reject Father's first contention.

As to Father's next point, we cannot agree that D.K. Jr.'s case is entirely "irrelevant" to the Children's case. We think it is important to note that, while Father's actions were not a basis for removing the Children from Stepmother's home, his failures with respect to D.K. Jr. were at least certainly in part the reason the Children could not live with him and instead had to be placed in foster care.

Neither can we conclude that Father substantially completed any of the permanency plans. At trial, DCS staff credited Father with completing a required alcohol and drug assessment in January 2013 and passing some, but not all, of the random drug screens. He also consistently exercised visitation with the Children and completed a parenting assessment. Otherwise, little progress was noted. DCS acknowledged that Father had completed an anger management class, a parenting class and a self-reported alcohol and drug assessment as required when D.K. Jr. entered the juvenile justice program. The case worker explained that some of those same requirements were again included in the Children's permanency plan a year later because of a "resurgence of behaviors" by Father that required further attention – Father's "aggressive nature with services providers, . . . failed drug screens and hair follicles," and his failure to attend to D.K. Jr.'s medication appointments, counseling appointments, and educational needs, during that child's 2012 failed trial home visit.

DCS found it necessary to subcontract with two separate in-home service agencies to assist Father in completing plan requirements due to his aggressive interactions with DCS case workers. Initially, Omni Visions provided "family reunification services." In a team meeting, Father stated he would like to "snap the neck" of the worker. He also pointed a finger at a case worker and said it was "a good thing that he did not hit women." As a result, Omni Visions workers were no longer allowed to have contact with Father. In December 2012, Foothills Care, Inc, was subcontracted for the same type of services. Again, little success was achieved. Father refused services or information for everything except alcohol and drug treatment. Even after reviewing positive drug screens with his case worker, he

denied having a drug problem and did not cooperate with drug treatment, so services were closed. Father refused housing information saying he intended to buy a bigger boat. Father also refused any parenting services. He said he knew how to raise his children.

Regarding visitation, the permanency plan included special conditions as a result of Father's aggressive behavior during the initial visits. Father was to bring snacks or meals for the Children; maintain appropriate contact during visits; arrive early to complete drug screens; and not discuss the case with the Children. Instead, case workers testified that Father confused the Children by telling them they were coming home soon. In April 2013, the Children's therapist arranged for Father to come in with the Children for family counseling. Father cancelled the appointment the day before and did not contact her again until three days before trial.

At trial, Father admitted that he was aware of the permanency plan requirements and understood them. He admitted to failing some drug screens. He claimed that he did not know where to go to attend parenting classes. Father was questioned regarding a meeting he had with a social worker to discuss alcohol and drug abuse and treatment:

> [Counsel]: What did you-all do when you met with her?
>
> [Father]: [S]he had a pamphlet. Kind of a thing that had all kinds of questions and . . . things like what have you lost because of alcohol and drugs, and I've not lost nothing.
>
> Q: Is it your testimony today that –
>
> The Court: Excuse me. What was that last statement?
>
> [Father]: Actually, I have. Other than my children, I have not lost nothing.
>
> The Court: Go ahead.
>
> Q: Do you believe that you have a substance abuse problem[] --
>
> [Father]: No.

Father underwent hernia surgery at the end of January 2013. He testified he still suffered complications and was seeing a specialist. Following surgery, Father was out of work through May of 2013. He testified he was employed through a temporary employment

agency at Conagra for a month but had not provided proof of employment or income to DCS because he had not been to the office to pick up the documents. Father testified he had reliable transportation. In later testimony, he admitted he did not have a license and said his wife drove them both as needed. He conceded he was convicted of driving on a suspended license in 2013. Father did not undergo a mental health assessment; he claimed that no one ever told him where or when to go. He said he had not yet contacted the Children's family counselor because he had only obtained her phone number just before trial.

Father admitted he had no room at the present time to accommodate the Children on his houseboat. He indicated he had lived on the boat for over a year, but would remedy the housing situation "by tomorrow" if the Children were to return. The DCS case worker testified that although the agency paid for Father's alcohol and drug assessment, because of Father's lack of cooperation, it was not completed until 2013. She further noted that Father completed none of the recommendations resulting from the alcohol and drug assessment, *i.e.*, a mental health assessment, medical evaluation, outpatient counseling, anger management, alcohol and drug treatment, and parenting classes. With respect to the Children's educational needs, Father testified he had participated in meetings with their teachers by telephone. Asked how he would address their specialized needs, Father testified that he would help them in any possible way and was "up for all suggestions" as, he claimed, he always had been. Father admitted he had not brought snacks or food for the Children during his visits until just before trial because, he claimed, he could not afford to do so.

In summary, the evidence demonstrates Father's substantial noncompliance with the permanency plan responsibilities. Father failed to complete required parenting classes, undergo a mental health assessment, or adhere to visitation policies all as outlined in the Children's plan. He failed to cooperate with service providers. At trial, he claimed to have recently worked, but provided no proof of employment or income to DCS as required. As to the question of "reliable transportation," Father conceded he had no license and was recently convicted of driving on a suspended license. Perhaps most significantly, he had given up a four-bedroom home for which DCS had provided rental assistance and moved to a small houseboat with only a single sleeping space that he and his wife shared. Father declined to investigate alternative housing options DCS offered and indicated he was content with his present living arrangements despite conceding that there was nowhere for the Children to sleep. In our view, the evidence supports the trial court's finding that Father failed or refused to acknowledge that he had problems and needed to make changes before he could hope to become a suitable custodian. Unfortunately, it appears, he was "all talk and no action" where the Children were concerned.

The evidence does not preponderate against the trial court's termination of Father's parental rights based on his failure to comply substantially with the terms of the parenting

plan.  There was clear and convincing evidence to support termination pursuant to Tenn. Code Ann. §  36-1-113(g)(2).

V.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests."  *In re Jeremiah I.R.,* E2013-00899-COA-R3-PT, 2013 WL 5448162  at * 6 (Tenn. Ct. App. E.S., filed Sept. 30, 2013)(quoting *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child."  *Id*.  In the present case, we have concluded that the trial court properly found the existence of a ground for terminating Father's rights.  Accordingly, we next consider whether the decision is in the best interest of the Children.  We are guided by the non-exclusive list of relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(i).[5]

_____

[5]The statute provides as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(continued...)

In setting forth its best-interest analysis, the trial court found as follows:

> [T]hese children had some serious issues that had not been addressed by either parent. . . . That led to serious health issues, emotional issues, adjustment issues, educational issues. All of which are now being addressed . . . successfully, it appears.
>
> [T]he children have gone from . . . basically, an antisocial or a behavioral pattern, unable to cope with the everyday stresses of life, to children that are now happy and interacting and looking forward to the future. The only concern, it appears. . . is the issue of whether their situation if permanent.
>
> It's clearly in their best interest to make that situation permanent. It's clearly in the best interest to terminate the parental rights . . . of both of these parents for the children, so that they can . . . be in a place where . . . their issues are dealt with appropriately, that they can be appropriately housed, fed, educated, medicated, loved, and cared for. And I so find.

Again, the evidence preponderates in favor of the trial court's findings. Since entering foster care, the twins, both of whom were diagnosed with bipolar disorder, had received therapy weekly. Their therapist reported they had an improved relationship with each other

---

[5](...continued)

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
>
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

and a reduction in episodes of "rages." A therapist also worked with the Children during and after school to address behavior issues.

John Porter served as the Court Appointed Special Advocate for the Children and D.K. Jr. He met with Father and visited the Children in their foster home. Mr. Porter reported that the Children expressed feeling safe and comfortable with their foster parents but were worried about their future and whether their situation would become permanent. Mr. Porter had not seen Father achieve the plan's goals or even make any real progress in addressing his drug use, lack of employment, or lack of suitable housing for the Children. He had addressed the Children's specialized education needs with him and "was not impressed" that Father was willing to address those needs.

Foster mother testified that the Children had joined her and her husband and their twelve-year-old daughter. Her husband worked, while foster mother stayed home and cared for the Children. She noted that the twins were behind in math and English, but no longer had to take speech therapy. All of the Children had extracurricular interests and hobbies that they intended to pursue further such as music and sports at school. The Children attended weekly therapy sessions. Foster mother testified their behavior was much improved from the time they first joined the family. She reported that E.K. had initially made homicidal threats. With medication and visits with her psychiatrist, "all that has stopped." Another child was "standoffish" and refused hugs, but now accepted hugs, laughed and joked with others. The foster parents had had no contact with Father.

We conclude that the evidence does not preponderate against the trial court's finding that termination is in the Children's best interest. In summary, Father had not "been there" for the Children for much of the past five years. Once the Children entered DCS custody and foster care, he failed to satisfy the permanency plan geared toward reuniting him and the Children. Aside from failing to address any of his apparent personal issues, he failed to take steps toward meeting the Children's most basic needs by securing a place for them to live. All the while, the Children lingered in foster care – happy, safe, and comfortable, but worried about permanency. By the time of trial, all three children were at or nearing their teenage years. We agree with the trial court's finding that the time for achieving successful permanency in their lives had come. The trial court did not err in its decision that permanently severing Father's parental rights is in the Children's best interest.

VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, D.K. Sr. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE